IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MISTY ANN JEMISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:14cv645-TFM |
| | ) | (WO) |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. PROCEDURAL HISTORY**

The plaintiff, Misty Ann Jemison ("Jemison"), applied for disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*., and for supplemental security income benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, on July 30, 2009, alleging that she is unable to work because of a disability. Jemison's application was denied at the initial administrative level. Jemison then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing on December 6, 2010, the ALJ determined that Jemison is not disabled. Jemison submitted a request for review to the Appeals Council. Upon considering Jemison's request, the Appeals Council vacated the ALJ's decision and remanded the case with directions that the ALJ should conduct further proceedings and issue a new decision. A supplemental hearing was conducted on June 19, 2012. Following this proceeding, the ALJ denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently

became the final decision of the Commissioner of Social Security ("Commissioner").[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   The parties have consented to the undersigned United States Magistrate Judge rendering a final judgment in this lawsuit.  The court has jurisdiction over this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

To make this determination,[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[2] Title 42 U.S.C. §§ 405(g) and 1383(c)(3) allow a plaintiff to appeal a final decision of the Commissioner to the district court in the district in which the plaintiff resides.

[3]  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

[The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[4] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

## III. INTRODUCTION

### A.  The Commissioner's Decision

Jemison was 38 years old at the supplemental hearing before the ALJ and has completed the twelfth grade. R. 55.  She alleges that she became disabled on June 15, 2009, due to degenerative disc disease, sciatic nerve problems, COPD, bronchitis, bipolar disorder, depression, generalized anxiety disorder, obsessive compulsive disorder, and agoraphobia. R. 52.  After the supplemental hearing, the ALJ found that Jemison suffers from severe impairments of degenerative disc disease; degenerative joint disease; bipolar disorder; personality disorder; agoraphobia; chronic depression; and chronic obstructive pulmonary disease.  R. 24.  He also found that she suffers from substance abuse as a non-severe impairment, specifically noting that the objective medical evidence indicates the condition is in remission.  R. 25.

The ALJ found that Jemison is unable to perform her past relevant work, but that she retains the residual functional capacity ("RFC") to perform light work with the following exceptions:

> . . . [T]he claimant is precluded from climbing ladders, ropes, and scaffolds.  The claimant can occasionally climb ramps and stairs.  The claimant can occasionally balance, kneel, crouch, crawl, and stoop.  The claimant must avoid concentrated exposure to humidity and wetness.  The claimant can have no exposure to dangerous machinery or unprotected heights.  The claimant cannot operate a motor vehicle.  The claimant cannot work around large open bodies of water.  During a regular scheduled workday or equivalent thereof, the claimant can understand and remember short and simple instructions.  The claimant can do simple, routine, repetitive tasks, but she is unable to do so with detailed or complex tasks.  The claimant can have occasional and casual contact with the general public and occasional contact

with co-workers.  The claimant can perform work in a well-spaced work environment.  The claimant can deal with changes in the work place, if introduced occasionally and gradually.  The claimant will miss one to two days of work per month due to psychological symptoms.  The claimant must be reminded of tasks two times per shift.

R. 27.  Testimony from a vocational expert led the ALJ to conclude that a significant number of jobs exists in the national economy that Jemison could perform, including work as a marker, laundry classifier, and folder.  R. 38.  Accordingly, the ALJ concluded that Jemison is not disabled.  R. 38-39.

### B.  The Plaintiff's Claims

Jemison presents the following issues for review:

(1)     The Commissioner's decision should be reversed, because the ALJ failed to properly consider the side effects of Jemison's prescribed medications upon her ability to work.

(2)     The Commissioner's decision should be reversed, because the ALJ's evaluation of the medical opinions of record with respect to Jemison's mental impairments lacks the support of substantial evidence.

(R. 8).

## IV.  DISCUSSION

Jemison asserts that the ALJ improperly discounted the opinion of her treating physician, Dr. Pantaleone.  In addition, she contends that the ALJ erred in assigning significant weight to the opinion of Dr. W.G. Brantley, a consultative psychologist, without resolving inconsistencies between his opinion and the conflicting opinions of Dr. Larry H. Dennis, Dr. Daniel Clark, and Dr. Arnold Mendingall.

The law is well-settled; the opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so. *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The Commissioner also demonstrates a similar preference for the opinion of treating physicians.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 CFR § 404.1527 (d)(2)). The ALJ's failure to give considerable weight to the treating physician's opinion is reversible error. *Broughton*, 776 F.2d at 961-2; *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir. 1982).

However, there are limited circumstances when the ALJ can disregard the treating physician's opinion. The requisite "good cause" for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). Good cause may also exist where a doctor's opinions are merely conclusory; inconsistent with the doctor's medical records; or unsupported by objective medical evidence. *See Jones v. Dep't. of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991); *Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991); *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987). The weight afforded to a physician's conclusory statements depends upon the

extent to which they are supported by clinical or laboratory findings and are consistent with other evidence of the claimant's impairment. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). The ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion. *Schnorr*, 816 F.2d at 581.

After reviewing the medical records, the ALJ discounted Dr. Pantaleone's opinion that the side effects of Jemison's medication would adversely affect her ability to work because his opinion "is not consistent with his findings or the objective medical evidence; and therefore assigned little weight." R. 35. The medical records indicate that Jemison has received extensive treatment from Dr. Nicholas C. Pantaleone, a doctor of internal medicine, on a routine basis from 1998 through 2014. R. 520-25, 806-837, 900-903, 1095-1100, 1145-51. During the relevant time period, Dr. Pantaleone repeatedly diagnosed Jemison as suffering from a disc bulge at C5/6, bipolar depression, obsessive compulsive disorder, generalized anxiety disorder, COPD, and agoraphobia. *Id.* He also routinely prescribed Lortab, Soma, Xanax, Percocet, Adderall, Pristiq, and other medications to treat her symptoms. R. 424-479, 900-903, 1095-1100, 1118-20, 1145-51.

Jemison also received treatment at Grandview Behavioral Health Center in 2008 and 2009. A mental health specialist diagnosed Jemison with bipolar disorder II. R. 794-95, 801-02. On June 9, 2009, the psychiatrist noted that Jemison's increased anxiety was possibly due to her dosage of Adderall. R. 797. On August 6, 2009, the psychiatrist noted that Jemison

was unable to stop crying and "just wants to sleep" and that she had stopped taking Adderall. R. 798.  The psychiatrist admitted Jemison into the hospital. *Id*.

After spending two days at Meadhaven Hospital, Jemison returned to Grandview Behavioral Center for a follow-up appointment on August 25, 2009. R. 799.  The psychiatrist found that Jemison had poor concentration, severe anxiety, and a fair energy level. *Id*.

On October 23, 2009, Dr. Brantley, a psychologist, conducted a consultative mental health evaluation, in which he found that Jemison was under the influence of medication. R. 840-41.  He noted that Jemison was "lethargic" and "sedated." R. 840.  Dr. Brantley also found that Jemison's "thought processing showed sedation" and cautioned that "[s]omatic concerns and need for redundant pain medications would need MD confirmation."  R. 841. He also found that if Jemison were "not sedated she would have presented normal" and that her "judgment and insight are optimized if not abusing substances and medications" and "degree of impairment is not severe or marked."  *Id*.  Dr. Brantley concluded that Jemison is "cognitively stable and lethargic due to drug use," that "[a]t work she would have no difficulty with coworkers, supervisors and the public, if not abusing meds," and that "[c]ooperation showed inconsistencies . . . that bordered on Malingering."  R. 841.  His diagnostic impression was (1) Bipolar II; (2) Polysubstance Abuse and Dependence of prescription and non-prescription drugs; (3) separate Anxiolytic Dependence longstanding; and (4) Personality Disorder NOS with Cluster B features. R. 841.

On November 6, 2009, Dr. Alan Babb, an internist, conducted a consultative evaluation, specifically noting that Jemison "has a very flat depressed . . . [and] listless kind

of affect . . . and has the appearance of someone who wants to just kind of roll over and go to sleep." R. 846.  Dr. Babb's diagnostic impression was (1) chronic back pain of unknown etiology; (2) chronic depression; (3) COPD with active tobacco use; (4) history of bipolar disorder, followed by local psychiatry; and (5) S/P recent cholecsystectomy, no sequela. *Id*. He concluded:

> The patient's main issue is chronic back pain.  Recent x-rays have shown no abnormality.  She has a significant amount of clinical depression and has been hospitalized in the past for episodes of depression, although she specifically did not mention suicidal ideation.  She is on a lot of sedating medications including Lortab, Soma, Ativan, Pristiq, Darvocet and Tegretol in some combination.  Again, she appears to be sedated somewhat here today. Clearly no one is going to hire her taking all of that medication, and I am not sure she should be on all that medication.  She is being followed by local pain management.  At this point, there is really no specific documentation for all of these chronic powerful pain medications.  X-rays have shown nothing pathologic.  She clearly appears to be depressed and effort and motivation appear to be very limited.

R. 846.

On January 4, 2010, a social worker at Montgomery Area Mental Health Authority formulated the following treatment goals for Jemison: (1) receive "the right meds to reduce depression so she can function"; and (2) reduce her fears of going outside her house and being around other people. R.1040.  A psychiatrist approved the treatment plan.  R. 1041.

During a deposition on September 16, 2010, Dr. Pantaleone testified about the course of treatment for Jemison and his reasons for prescribing her certain medications. R. 880-897. He also summarized his findings regarding Jemison's ability to work as follows:

> It's doubtful [she is able to engage in substantial, gainful employement] because she has multiple problems including – the things that really preclude

9

it is, number one, the neck pain.  Which we have documentation of the C5-6 herniation.  So, you know, at times it will get better, and at times it will get worse.  It's probably worsened over the years.  And the CAT scan is from 2001.  So if I get a chance to repeat that, I may even show a worsening of the herniation of the disk.

She has intermittent low back pain.  Same spot. It's on the left side, into the left hip and leg leg.  Again, that's consistent with a pinched nerve or a lumbar radiculitis possibly from the disk there, but I don't have a CAT scan to confirm that.  But the symptoms match that diagnosis.  The headaches can be exacerbated by that disk in her neck, but there's also a migraine component to it.

So – and the anxiety and depression and questionably bipolar is another problem where . . . she's going to have mood swings, both depression and anxiety.  And that's consistent with bipolar disease, though she's not really on an atypical psychotic right now which is a medicine they use to treat bipolar and schizophrenia, but she is on an antidepressant.  She's been on a number of antidepressants.  She's been on a SSRI's, Paxil; she's been on SNRI's, the Paroxetine.  And, you know, doctor – the psychiatrist, Dr. Aboloti (phonetic) or something had seen her also in the past. . . .

So, you know, she has a lot of problems, but – it's going to be tough. I think one of the biggest obstacles is going to be the bipolar disease, the anxiety and depression.  Again, she's not on really potent antipsychotic medications yet, but she is on antidepressants.  She does take Xanax.  I'm hoping that will be enough to keep her under control.

R. 893-95.

He also testified regarding the effects of medication on Jemison's ability to perform

work as follows:

Well, she's on pain medication.  She takes Lortab; she takes Darvocet for the pain medicine.  I'm sure she takes Advil or Aleve over the counter.  I don't really prescribe that stuff for her. She takes Xanax for her nerve[s] when she gets too hyper, and she's on Pristiq when she's down.  So supposedly that's supposed to help.  It's helping – it helps depression, and the Xanax calms her down when that happens.

10

That makes it harder to work. Because if you're taking a lot of medicine, you can become somnolent and sleepy, and then you can't concentrate, things like that.

I tried her on a stimulant at one time. I had tried her on some Adderal. And it exacerbated her anxiety, so I had to wean her off of that. You know, it was a stimulant to try to get her to concentrate better, and . . . I was toying with the diagnosis of Attention Deficit Hyperactivity Disorder . . . but she couldn't tolerate the stimulant.

R. 896.

On November 17, 2010, Jemison went to Montgomery Area Mental Health Authority complaining of difficulty sleeping and that her medications were not working. R. 1038. The nurse noted that her appearance and affect were inappropriate and referred Jemison to the CRNP. *Id.* The certified nurse practitioner noted that Jemison's mood was euthymic and recommended that Jemison continue taking Effexor and increased her prescription for Tegretol. R. 1037.

Jemison returned to Montgomery Area Mental Health Authority on February 10, 2011. A nurse noted that Jemison's affect was inappropriate and flat, her mood was "down," her thoughts were suicidal, and her sleep was poor. R. 1036. She reported that Prestiq was not effective but denied any side effects. *Id.* The nurse referred her to a certified nurse practitioner. *Id.* During an evaluation by the CRNP, Jemison complained of "mood swings real bad." R. 1035. The CRNP assessed that Jemison was alert and well oriented but that her mood was depressed. *Id.* She prescribed Geodon for the treatment of her symptoms. *Id.*

On March 4, 2011, a mental health therapist and evaluator at Montgomery Area Health Authority conducted an intake diagnostic assessment, noting that Jemison reported

11

that the following psychiatric symptoms were interfering with her goals: depressed mood/sadness; diminished interest/pleasure; insomnia; agitation; fatigue/loss of energy; feelings of worthlessness; inappropriate guilty; decreased concentration/ability to think; recurrent thoughts of death; depressive symptoms in past; elevated/expansive mood; inflated self-esteem; decreased need for sleep; pressured speech; flight of ideas/racing thoughts; high-risk behaviors; manic symptoms in past; palpitations; increased heart rate; sweating; trembling/shaking; shortness of breath; feeling of choking; chest pain; chills/hot flushes; obsessions/compulsions; and agoraphobia.  R. 1048.  They also formulated two goals for Jemison: (1) decrease depression and manic episodes, and (2) manage anxiety.  R. 1107-08. To reach these goals, mental health personnel listed the following objectives: (1) "take meds as prescribed"; (2) "change . . . talk . . . from negative to positive"; and (3) increase physical and social activity. *Id*.

On March 10, 2011, the CRNP completed a service report, noting Jemison complained that Goedone did not work and "made [her] feel out of it so [she] stopped taking it."  R. 1044. The CRNP increased Jemison's prescription for Effexor, decreased her prescription for Tegretol, discontinued her prescription for Geodone, and prescribed Trazadone.  *Id*.

On March 15, 2011, Dr. Daniel C. Clark, a licensed psychologist, conducted a confidential disability evaluation.  R. 1050.  The psychologist found that Jemison's intellectual abilities fall within the low average range and that her judgment and decision-making abilities are impaired due to impulsivity.  R. 1054.  In addition, Dr. Clark found that Jemison is "moderately impaired in her ability to understand and remember instructions, and

12

she is severely impaired in her ability to carry out instructions and in her ability to respond appropriately to supervision, coworkers, and work pressures in a work setting" and that she "would require assistance handling any awarded funds due to impulsivity." R. 1054-55.  He also noted that his findings are considered to be a valid indication of Jemison's current level of functioning because she appeared to be open and honest throughout the evaluation.  R. 1054.

On March 18, 2011, Dr. Mindingall, a non-examining psychologist, completed a psychiatric review technique form in which he indicated Jemison would be moderately limited with respect to her activities of daily living, social functioning, and concentration, persistence, or pace. R. 1067.  Dr. Mindingall also assessed that Jemison has the following mental residual functional capacity:

> A. [Jemison] is able to understand, remember, and carry out simple instructions but will likely have greater difficulty with more detailed and complex instructions.

> B. [Jemison] can carry[]out simple tasks but not detailed or complex ones due to symptoms of anxiety and depression. [Jemison] should be able to concentrate and attend to simple tasks for 2 hours and will need all customary rests and breaks. [Jemison] would be expected to miss 1-2 days of work per month due to exacerbation of her psychiatric symptoms.

> C. [Jemison's] interaction with the public, coworkers and supervisors should be casual and not intense or prolonged.  Feedback should be supportive and non-threatening.

> D.  Changes in work setting or routine should be presented gradually and infrequently to give time for adjustment. [Jemison] would need help with goal setting and planning.

R. 1073.

13

On March 24, 2011, Dr. Babb, a doctor of internal medicine, conducted a consultative evaluation. His diagnostic impression was: (1) history of bipolar disorder, no documentation provided; (2) chronic depression; (3) history of agoraphobia; (4) low back pain of unknown etiology, no evaluation to date; (4) COPD with active tobacco abuse; and (6) acute upper respiratory infection. R. 1078. Dr. Babb found:

> The patient is on an extensive list of medications including antidepressants and stimulants. What is alarming is the fact that she is getting these medications from two different medical sources. She is on antidepressants which including chronic Lortab and Xanax use. Then on top of that, she is taking stimulants of Adderall. There does not seem to be a consistency in treatment objectives with this cornucopia of drugs. . . .

> The patient's main issue appears to be psychiatric and she is being followed by a local Mental Health Facility. What I am alarmed about is that the fact that she is getting psychiatric meds and pain medications, including powerful narcotics from an outside source. She needs one person writing all of her medications. I certainly don't see the point of her being on all of these antidepressants and all these chronic narcotics without any documented need for this.

> She really needs to be considered for medical cleansing [with] all of her medications and then slowly started back to figure out what will get her feeling better. I certainly don't see the point of her being on Lortab and Xanax with all of these other drugs. This is certainly of great concern.

R. 1078-79.

On August 2, 2011, Dr. Pantaleone completed a Clinical Assessment of Pain form in which he indicated that "drug side effects can be expected to be significant and to limit effectiveness due to distraction, inattention, drowsiness, etc." R. 1091. He also noted that Jemison's medication, which includes Lortab, Xanax, Soma, Adderall, Percocet, and Prestiq, would adversely affect her ability to work. R. 1093. In addition, he indicated that Jemison

14

would likely be absent from work as a result of her impairments and/or treatment more than four days per month. R. 1092.

Jemison returned to Montgomery Area Mental Health Authority on September 14, 2011, complaining that she was not sleeping well and that she was "seeing shadows [and] hearing voices." R. 1112.  A certified nurse practitioner at Montgomery Area Mental Health Authority completed a service report, listing a diagnosis of bipolar disorder and non-compliance.  She also listed generalized anxiety disorder, obsessive compulsive disorder, agoraphobia with a notation of "no [signs] here." R. 1111.  The nurse practitioner noted that Jemison was currently taking medication prescribed by Dr. Pantaleone, including Abilify, Pristiq, Tegretol, Xanax, and Lortab.  R. 1111.  She found that Jemison was "alert, over medicated, well oriented, [with a] mood subdued." *Id.*  The nurse practitioner prescribed Doxepin and Tegretol.  *Id.*

On February 2, 2012, the certified nurse practitioner listed diagnoses of bipolar disorder, generalized anxiety disorder, obsessive compulsive disorder, agoraphobia, and non-compliance. R. 1101. Jemison reported that she had moved to Florence, Alabama, and that her physician prescribed Cymbalta but the mental health center prescribed Abilify.  *Id.* The nurse practitioner noted that Jemison was alert and well oriented, mood was euthymic, and her speech was appropriate.  *Id.*  She advised Jemison to discontinue Carbamazepine and Doxepin and prescribed Abilify and Cymbalta.  *Id.*

On May 15, 2012, Jemison presented to Baptist Health Hospital with complaints of a sharp pain in her lower back radiating down her left leg. R. 1122.  The emergency room

physician diagnosed sciatica and prescribed Percocet and Prednisone. R. 1123, 1125, 1127.

First, the court cannot determine whether the ALJ's determination is supported by substantial evidence because he failed to reconcile the conflicting reports of the treating and consultative physicians when discounting Dr. Pantaleone's opinion that the side effects of medication would not adversely affect Jemison's ability to work.  When there is a conflict, inconsistency, or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected an opinion regarding the plaintiff's capacity for work. *See generally Wolfe v. Chater*, 861 F.3d 1072, 1079 (11th Cir. 1996); *Johnson v. Barnhart*, 138 Fed. Appx. 266, 271 (11th Cir. 2005). The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992).  The court recognizes that Dr. Brantley cautioned that the need for redundant pain medication "would need MD confirmation" and that Dr. Babb expressed concern about the need for medication. R. 841-846.  However, Jemison subsequently received a doctor's confirmation regarding the need for her prescribed medications.  For example, in January 2010, a psychiatrist approved a treatment plan for Jemison, which included a plan to receive "the right meds to reduce depression so she can function." R. 1041.  Additionally, in September 2010, Dr. Pantaleone testified about his reasons for the course of treatment for Jemison and his reasons for prescribing her certain medications. R. 893-95.  She also continued to receive treatment from

16

both Dr. Pantaleone and Montgomery Area Mental Health on a routine basis.

The record indicates that Jemison has received conflicting advice about the need for her prescribed medications.  For example, on March 4, 2011, mental health personnel encouraged Jemison to take her medication as prescribed in order to decrease her depression and manic episodes and manage anxiety. R. 1048.  Three weeks later, however, Dr. Babb conducted a consultative evaluation and noted his alarm that Jemison was receiving strong psychiatric and pain medications.  Dr. Babb recommended that Jemison "be considered for medical cleansing [with] all of her medications and then slowly started back to figure out what will get her feeling better." R. 1078-79.  Nothing in the record indicates that Jemison was provided the recommended cleansing or that a pain specialist or other medical specialist resolved these inconsistencies during the 2012 hearing before the ALJ or by conducting an evaluation to determine whether Jemison's medications are necessary for her specific impairments.  More importantly, despite medical records indicating that Jemison may suffer from polysubstance and/or anxiolytic abuse, the ALJ did not fully resolve whether this assessed condition is a contributing factor material to his disability determination.  *See Doughty v. Apfel*, 245 F.3d 1274, 1276 (11th Cir. 2001).

The ALJ discounted Dr. Pantaleone's opinion regarding the severity of Jemison's impairments because "his findings are not consistent with his opinion." R. 35.  As support for his determination, the ALJ found that Dr. Pantaleone noted that Jemison needed a CT or MRI to confirm any lumbar or disc disease, but that an x-ray of Jemison's spine was negative.  *Id.*  The problem with the ALJ's finding is that Dr. Pantaleone testified that he has

been unable to order additional CAT scans, MRI's, or other radiological testing.  It is obvious, however, that Jemison has not received additional testing to confirm the source of her back, neck, and leg pain because she is unable to afford treatment.  R. 693-94, 714, 919, 1121, 1145.

The court concludes that the ALJ erred in failing to fully develop the record regarding the extent of Jemison's impairments.  Notwithstanding evidence in the record indicating that Jemison repeatedly complained of back pain during the relevant time period, the ALJ took no steps to explore the severity of Jemison's condition by securing additional testing by a medical specialist.  The record does not include records of a recommended MRI or CT scan. It is error for the ALJ to fail to obtain additional testing or otherwise develop the evidence, if that information is necessary to make an informed decision.  *See Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Freel v. Astrue*, 2012 WL 628463, *6 (M.D. Fla. 2012) ("The ALJ is not required to order a consultative examination or additional testing unless the record shows that such an examination is necessary for the ALJ to render a decision."). Because the ALJ's reasons for discounting the treating physician's opinions is based on the lack of objective medical evidence and it is documented that the reason for the lack of certain medical records is Jemison's inability to afford treatment, the court cannot conclude that the lack of evidence is a sufficient reason on its own for discounting the physicians' opinion. Consequently, on remand, the ALJ shall consider whether ordering a CT scan or MRI would assist him in determining Jemison's disability status.

Finally, the court concludes that the Commissioner failed to consider Jemison's

18

inability to afford medical treatment when determining that Cook has the residual functional capacity to return to her perform light work.  The ALJ discredited Jemison's allegations of disabling symptoms based on non-compliance with prescribed medications.  The record, however, indicates that Jemison's non-compliance with recommended treatment was due to her inability to afford prescribed medications and other treatment.  While failure to seek treatment is a legitimate basis to discredit the testimony of a claimant, it is the law in this circuit that poverty excuses non-compliance with prescribed medical treatment or the failure to seek treatment.  *Dawkins v. Bowen*, 848 F.2d 1211 (11th Cir. 1988).  As previously discussed, the medical records are replete with references to Jemison's inability to afford treatment.  R. 693-94, 714, 919, 1121, 1145.  In addition, Jemison testified that the reason she did not take her medications as directed is because of finances.  R. 63.  Despite notations indicating Jemison is uninsured and is unable to afford treatment, the Commissioner failed to consider whether Jemison's financial condition prevented her from seeking medical treatment.  Thus, this court cannot conclude that the Commissioner's discrediting of Jemison based on her non-compliance is supported by substantial evidence.

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad.

*Id*.  The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

For these reasons, the court concludes that the Commissioner erred as a matter of law, and that the case should be remanded for further proceedings.

## VI.  CONCLUSION

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 10th day of February, 2015.


    /s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

20